UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ROBERT "BOBBY" HOPKINS, CHRISTOPHER ARROYO, and CHARLES JEFFERS, Individually and on behalf of all other persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE WYKAGYL COUNTRY CLUB, <br><br> Defendant. | ECF CASE <br><br> No.: 7:22-cv-10399 (CS) <br><br> FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

Plaintiffs Robert "Bobby" Hopkins, Christopher Arroyo and Charles Jeffers, on behalf of themselves and all others similarly situated, hereby allege through their attorneys, Lipsky Lowe LLP, as against Defendant The Wykagyl Country Club as follows:

<u>NATURE OF THE ACTION</u>

1.     Wykagyl Country Club is a private golf club.

2.     Plaintiffs Hopkins, Arroyo and Jeffers worked for Wykagyl Country Club as Golf Caddies.

3.     Plaintiffs Hopkins, Arroyo and Jeffers assert, on their behalf and other similarly situated individuals, that Wykagyl Country Club willfully violated the New York Labor Law by (i) failing to pay the minimum wage, (ii) failing to pay overtime premium pay, (iii) failing to pay the spread-of-hours pay; (iv) failing to provide the N.Y. Lab. Law § 195.1 notice; and (v) failing to provide the N.Y. Lab. Law § 195.3 wage statements.

4.     Plaintiffs Hopkins, Arroyo and Jeffers assert, on their behalf and other similarly situated individuals, that Wykagyl Country Club willfully violated the Fair Labor Standards Act by (i) failing to pay the minimum wage and (ii) failing to pay overtime premium pay.

5.     Plaintiff Hopkins asserts individual retaliation claims under the Labor Law and Fair Labor Standards Act.

<u>JURISDICTION & VENUE</u>

6.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 1337 and 1343, supplemental jurisdiction over the Labor Law claims under 28 U.S.C. § 1367, and jurisdiction over the FLSA claims under 29 U.S.C. § 216(b).

7.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2).

8.     This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

<u>THE PARTIES</u>

9.     Plaintiff Hopkins was and is, at all relevant times, an adult individual residing in the State of New York.

10.     Plaintiff Jeffers was and is, at all relevant times, an adult individual residing in the State of New York.

11.     Plaintiff Arroyo was and is, at all relevant times, an adult individual residing in the State of New York.

12.     Wykagyl Country Club is, upon information and belief, a domestic not-for-profit corporation that is organized under New York law and is authorized to do

business in the State of New York. Its principal place of business is at 1195 North Avenue, New Rochelle, New York.

13. Wykagyl Country Club, at all relevant times, employed Plaintiffs Hopkins, Arroyo and Jeffers and the Class and Collective Action Members (as defined below).

14. Upon information and belief, Wykagyl Country Club is an enterprise engaged in commerce or in the production of goods for commerce. Wykagyl Country Club is engaged in commerce or in the production of goods for commerce, because, *inter alia*, it has employees that handle goods and materials that have been produced for and moved in commerce, and, upon information and belief, its annual gross volume of business is at least $500,000. These goods and services include computers, glassware, and golf shirts.

## STATEMENT OF FACTS

Background[1]

15. Wykagyl Country Club is a private golf club in New Rochelle, New York.

16. Wykagyl Country Club was incorporated in 1898 and its current golf course dates back to 1905.

17. Wykagyl Country Club has hosted several events, including the Palm Beach Round Robin from 1948 through 1952, 1956 and 1957, the Red Cross Tournament in 1944, the LPGA Talk Tournament in 1977, the LPGA Golden Lights Championship from 1978 through 1980, the LPGA Chrysler - Plymouth Classic in 1982, the LPGA Master Card International Pro-Am in 1984, the Japan Airlines Big Apple Classic from

---

[1] The headers are only for organizational purposes.

1990 through 2000, the LPGA Sybase Classic from 2001 through 2006, and the 2007 HSBC Women's World Match Play Championship.

18.     Wykagyl Country Club is a private club that requires a one-time initiation fee and annual dues.

19.     Wykagyl Country Club has 250-300 members.

20.     Wykagyl Country Club employs Golf Caddies during the golf season: late March to December, weather dependent. For most years, the season ended in November.

21.     Wykagyl Country Club employs approximately 60 Golf Caddies at any one time.

22.     Wykagyl Country Club, at all relevant times, employs an individual in the "Caddy Master" position.

23.     Wykagyl Country Club's Caddy Master has numerous responsibilities and duties concerning Golf Caddies, including pairing them with a golfer, supervising them, hiring and firing them, interviewing them, scheduling them, determining whether they will work on a particular day, disciplining them, setting the time of day by when they must report to the Club, telling them when they are done working for the day, and discussing with Golf Caddies when a member complains about them.

24.     In a February 26, 2019 post on GlassDoor, an individual describes the interview process: "I applied in-person. The process took 2 days . . . you go in and talk to the caddie master and pro shop members and see if you're the right fit."

25.     Wykagyl Country Club requires its Golf Caddies to wear the same uniform: green bib with the Club's insignia and Caddy's name, white shirt and khaki shorts. The Club provides the bib.

26.     With this level of control over them, Golf Caddies are not free from control or direction over their performance.

27.     The Golf Caddy's work is squarely within, intertwined with and integral with the usual course of business and services that Wykagyl Country Club offers: golf.

28.     Golf Caddies are an intricate part of the experience of playing a round of golf at Wykagyl Country Club.

29.     Wykagyl Country Club requires golfers to use golf caddies if they are in a three-some or more.

30.     About 90% of golfers at Wykagyl Country Club use a Golf Caddy.

31.     Wykagyl Country Club's Golf Caddies often work exclusively at the Club for multiple continuous years during the golf season.

32.     Golf Caddies must be on Wykagyl Country Club property for the Caddy Master to assign them.

33.     The strong majority of golfers do not know what Golf Caddy will be assigned to them until the Caddy Master assigns them.

34.     If a Golf Caddy cannot, for whatever reason, do the loop after being assigned to a golfer, it is the Caddy Master, not the Golf Caddy, who finds a replacement.

35.     Wykagyl Country Club has a caddy appreciation day when the Club allows the Golf Caddies to play a round and provides a catered lunch for the Golf Caddies.

Duties

36.     Golf Caddies' duties involve carrying the golf bag for one or two golfers (doing a "loop").

37.     Wykagyl Country Club requires the Golf Caddies to carry the golfers' bags on foot.

38.     In addition to carrying the golfers' golf bags, Golf Caddies are required to find, identify and retrieve golfers' golf balls, clean the golfers' clubs and balls, correct divots on the golf course, rake sand traps after use, remove the flag from the hole on the putting green, and provide the golfers, when asked, with suggestions on what club to use and information on the course.

39.     The Golf Caddies perform all of their duties on Wykagyl Country Club property.

Hours and Days Worked

40.     When Wykagyl Country Club's Golf Caddies arrive at the Club, they are required to sign and check in with the Caddy Master so the Caddy Master knows they are available to be assigned to a golfer.

41.     Golf Caddies typically arrive at the Club around 7:00 a.m.

42.     Golf Caddies typically stop working at the Club between 4:00 p.m. and 6:00 p.m., largely depending on when it gets dark.

43.     The majority of Wykagyl Country Club's Golf Caddies work 6 days a week, with some regularly working 7 days and others working 7 days only if there is an outing at the Club.

44.     Golf Caddies typically work more hours as the weather warms up and there is more daylight.

45.     Golf Caddies typically work between 40 and 54 hours a week.

46.     A round of golf at Wykagyl Country Club is typically between 4 and 4.5 hours.

47.     Golf Caddies will, typically, caddy 1 or 2 rounds each day.

48.     The Caddy Master decides how many rounds of golf a Golf Caddy will work in any given day.

49.     The Caddy Master possesses and exercises meaningful discretion in rewarding and punishing Golf Caddies.

50.     The Caddy Master rewards Golf Caddies who regularly arrive early by quickly assigning them a golfer in the morning and then assigning them another golfer later in the day.

51.     Golf Caddies who take early morning loops are much more likely to be assigned an afternoon round by the Caddy Master, which results in the Caddies receiving more compensation[2].

52.     The Caddy Master often penalizes Golf Caddies who refuse loops or miss their tee time by firing them or not assigning them a loop that day.

53.     Every morning when Golf Caddies arrive, they have to sign in by the Caddy Master and then wait for the Caddy Master to assign them.

54.     An event sheet exists in the Golf Caddy waiting area, that lists tournaments and other events when the Club mandates attendance by the Golf Caddies.

55.     The Caddy Master will send weekly emails to the Golf Caddies telling them about Club events.

---

[2] In using the term "compensation, Plaintiffs do not concede the money the Class and Collective Action Members and they receive from the golfers constitutes compensation or remuneration from the Club. The term is used solely for ease of reference.

56. During tournaments, Wykagyl Country Club requires all of the Golf Caddies to work those days.

## Compensation and Statutory Requirements

57. Wykagyl Country Club does not pay its Golf Caddies any hourly rate, by salary, by piece rate or any other form of compensation.

58. When the Golf Caddies work more than 40 hours in a week, Wykagyl Country Club does not pay them overtime premium pay: 1.5 times their hourly rate.

59. The only compensation that the Golf Caddies receive comes directly from the golfers.

60. Golf Caddies are typically assigned two golfers per loop.

61. Golfers pay the Golf Caddies a $120 fee per each golf bag they carry.

62. Wykagyl Country Club determines the fee per golf bag.

63. Golf Caddies have no input or ability to change the fee per bag.

64. Golf Caddies are not permitted to negotiate the bag fee.

65. Wykagyl Country Club's Golf Caddies keep 100% of the bag fee.

66. Wykagyl Country Club's Golf Caddies are under no obligation to share any of the bag fees with the Club.

67. Tipping Golf Caddies is at the golfers' discretion, with golfers tipping the Golf Caddies various amounts.

68. Golfers often, but not always, tip the Golf Caddies.

69. The bag fee and tips are Golf Caddies' sole compensation.

70. Wykagyl Country Club does not pay Golf Caddies for the time they spend waiting for the Caddy Master to assign them a golfer.

71.     Wykagyl Country Club does not pay Golf Caddies spread-of-hours pay: an extra hour of pay at the minimum wage when they work more than 10 hours.

72.     Wykagyl Country Club does not provide its Golf Caddies with any wage statements.

73.     Wykagyl Country Club does not provide its Golf Caddies with the Notice and Acknowledgment of Payrate and Payday under N.Y. Lab. Law § 195.1.

74.     Wykagyl Country Club never notified, verbally or in writing, it considers its Golf Caddies to be tipped employees and that it was claiming a tip credit against the minimum wage.

75.     No agreement exists between Wykagyl Country Club and its Golf Caddies that the bag fees or gratuities would count towards Wykagyl Country Club's obligation to pay them a minimum wage and overtime.

76.     Wykagyl Country Club does not keep records of how much in bag fees are paid to its Golf Caddies.

77.     Wykagyl Country Club does not track which Golf Caddies are paid bag fees and tips.

78.     Wykagyl Country Club does not invoice the golfers for the bag fees.

79.     Wykagyl Country Club does not keep accurate records of the number of loops its Golf Caddies work in a day or a week.

80.     Wykagyl Country Club does not collect and distribute the bag fees to its Golf Caddies.

81.     Wykagyl Country Club takes no steps to ensure that the golfers pay its Golf Caddies either the bag fee or tips.

82.     Wykagyl Country Club does not keep records of when its Golf Caddies start and stop working on each day.

83.     Wykagyl Country Club does keep accurate records of the number of loops its Golf Caddies work in a day.

84.     Wykagyl Country Club does not, upon information and belief, include the bag fees in its gross receipts.

85.     Wykagyl Country Club does not post a poster that advises its Golf Caddies of their right to a minimum wage and overtime.

Bobby Hopkins' Hours Worked and Compensation

86.     Wykagyl Country Club employed Plaintiff Hopkins as a Golf Caddy from 1993 to November 2022.

87.     While working as a Golf Caddy for Wykagyl Country Club, Plaintiff Hopkins did not work at any other club during its season.

88.     During the golf season at Wykagyl Country Club, Plaintiff Hopkins normally worked Tuesday to Sunday and would sometimes work on Mondays if there was a golf outing.

89.     During each golf season at Wykagyl Country Club, Plaintiff Hopkins worked the following regular schedules:

        a.      For March, he worked Wednesday from 9:00 a.m. to 5:00 p.m. (8 hours), Thursday from 8:00 a.m. to 5:00 p.m. (9 hours), Friday from 7:15 a.m. to at least 3:30 p.m. (8 hours and 15 minutes), and Saturday and Sunday from 6:00 a.m. to 2:00 p.m. (8 hours). He, thus, worked a total of at least 41 hours and 15 minutes during the weeks of March.

b.      For the first half of April, he worked Wednesday from 9:30 a.m. to 5:00 p.m. (7 hours and 30 minutes), Thursday from 8:00 a.m. to at least 4:00 p.m. (8 hours), Friday from 7:15 a.m. to 4:30 p.m. (9 hours and 15 minutes), and Saturday and Sunday from 6:00 a.m. to 2:00 p.m. (8 hours). He, thus, worked at least 40 hours and 45 minutes during the first half of April.

c.      For the second half of April, he worked Wednesday from 9:30 a.m. to 5:00 p.m. (7 hours and 30 minutes), Thursday from 8:00 a.m. to at least 4:00 p.m. (8 hours), Friday from 7:15 a.m. to 2:00 p.m. (6 hours and 45 minutes), and Saturday and Sunday from 6:00 a.m. to 2:00 p.m. (8 hours). He, thus, worked a total of at least 38 hours and 15 minutes during the second half of April.

d.      For May to July, he worked Tuesday from 9:00 a.m. to 2:00 p.m. (5 hours), Wednesday from 9:30 a.m. to 5:00 p.m. (7 hours and 30 minutes), Thursday from 8:00 a.m. to at least 4:00 p.m. (8 hours), Friday from 7:15 a.m. to 2:00 p.m. (6 hours and 45 minutes), and Saturday and Sunday from 6:00 a.m. to 2:00 p.m. (8 hours). He, thus, worked a total of at least 43 hours and 15 minutes during the weeks of May, June and July.

e.      For August, he worked Wednesday from 9:30 a.m. to 5:00 p.m. (7 hours and 30 minutes), Thursday from 8:00 a.m. to at least 4:00 p.m. (8 hours), Friday from 7:15 a.m. to 3:00 p.m. (7 hours and 45 minutes), Saturday and Sunday from 6:00 a.m. to 2:00 p.m. (8 hours). He, thus, worked a total of at least 39 hours and 15 minutes during the weeks of August.

f.      For the first week of September, he worked Friday from 6:15 a.m. to at least 4:00 p.m. (9 hours and 45 minutes), Saturday and Sunday from 6:00 a.m. to

4:00 p.m. (10 hours), and Labor Day from 6:00 a.m. to 5:00 p.m. (11 hours). He, thus, worked a total of at least 40 hours and 45 minutes during the first week of September.

g. For the second week of September, he worked Saturday and Sunday from 6:00 a.m. to 3:00 p.m. (9 hours). He, thus, worked a total of at least 18 hours during the second week of September.

h. For the third and fourth weeks of September, he worked Wednesday from 9:30 a.m. to 5:00 p.m. (7 hours and 30 minutes), Thursday from 7:00 a.m. to 6:00 p.m. (11 hours), Friday, Saturday and Sunday from 6:00 a.m. to 5:00 p.m. (11 hours). He, thus, worked a total of at least 51 hours and 30 minutes during the third and fourth weeks of September.

i. For first three weeks of October, he worked Tuesday from 8:00 a.m. to 5:00 p.m. (9 hours), Wednesday from 8:00 a.m. to at least 4:00 p.m. (8 hours), Thursday from 8:00 a.m. to 5:00 p.m. (9 hours), Friday from 7:15 a.m. to 5:00 p.m. (9 hours and 45 minutes), and Saturday and Sunday from 6:15 a.m. to 5:00 p.m. (10 hours and 45 minutes). He, thus, worked a total of at least 56 hours and 30 minutes during the first three weeks of October.

j. For first last week of October through Thanksgiving week, he worked Wednesday and Thursday from 8:00 a.m. to 5:00 p.m. (9 hours), Friday from 7:30 a.m. to 5:00 p.m. (9 hours and 30 minutes), and Saturday and Sunday from 6:30 a.m. to at least 4:00 p.m. (9 hours and 30 minutes). He, thus, worked a total of at least 37 hours and 30 minutes during the last week of October through Thanksgiving week.

90.     Wykagyl Country Club did not pay Plaintiff Hopkins any compensation during his employment with the Club, not an hourly rate, salary or any other form of compensation.

91.     The sole compensation Plaintiff Hopkins received during his employment with Wykagyl Country Club came from the golfers: the bag fees and tips.

92.     Wykagyl Country Club did not pay Plaintiff Hopkins the statutory minimum wage.

93.     Wykagyl Country Club did not pay Plaintiff Hopkins overtime premium pay.

94.     Wykagyl Country Club did not pay Plaintiff Hopkins spread-of-hours pay.

95.     Wykagyl Country Club did not provide Plaintiff Hopkins with any wage statements.

96.     Wykagyl Country Club did not provide Plaintiff Hopkins with the Notice and Acknowledgment of Payrate and Payday under N.Y. Lab. Law § 195.1.

97.     Plaintiff Hopkins is subject to the same policies, procedures, control and oversight that other Wykagyl Country Club Golf Caddies were subjected to.

98.     Plaintiff Hopkins knows from personal conversations and observations that he performed the same duties as other Golf Caddies, worked approximately the same hours, was compensated the same way and was subject to the same policies and procedures as them.

Charles Jeffers' Hours Worked and Compensation

99.     Wykagyl Country Club employed Plaintiff Jeffers as a Golf Caddy from 1985 to November 2022.

100.    While working as a Golf Caddy for Wykagyl Country Club, Plaintiff Jeffers did not work at any other club during its season.

101.    During each golf season at Wykagyl Country Club, Plaintiff Jeffers worked the following regular schedules:

      a.    For March, he worked Monday to Sunday from 6:00 a.m. to at least 6:00 p.m. (12 hours). He, thus, worked a total of at least 84 hours during the weeks of March.

      b.    For April, he worked Monday to Sunday from 6:00 a.m. to at least 6:00 p.m. (12 hours). He, thus, worked a total of at least 84 hours during the weeks of April.

      c.    For May, he worked Tuesday to Sunday from 6:00 a.m. to at least 6:00 p.m. (12 hours). He, thus, worked a total of at least 72 hours during the weeks of May.

      d.    For June, he worked Monday to Sunday from 6:00 a.m. to at least 6:00 p.m. (12 hours). He, thus, worked a total of at least 84 hours during the weeks of June.

      e.    For July, he worked Monday to Sunday from 6:00 a.m. to at least 6:00 p.m. (12 hours). He, thus, worked a total of at least 84 hours during the weeks of July.

      f.    For August, he worked Monday to Sunday from 7:00 a.m. to at least 6:00 p.m. (11 hours). He, thus, worked a total of at least 77 hours during the weeks of August.

g.    For September, he worked Monday to Sunday from 9:00 a.m. to at least 6:00 p.m. (9 hours). He, thus, worked a total of at least 63 hours during the weeks of September.

h.    For October, he worked Monday to Sunday from 6:00 a.m. to at least 6:00 p.m. (12 hours). He, thus, worked a total of at least 84 hours during the weeks of October.

i.    For November, he worked Monday to Sunday from 8:00 a.m. to at least 2:00 p.m. (6 hours). He, thus, worked a total of at least 42 hours during the weeks of November.

102.    Wykagyl Country Club did not pay Plaintiff Jeffers any compensation during his employment with the Club, not an hourly rate, salary or any other form of compensation.

103.    Plaintiff Jeffers would, sometimes, be waiting at Wykagyl Country Club up to 4 hours before the Caddy Master assigned him a loop.

104.    The sole compensation Plaintiff Jeffers received during his employment with Wykagyl Country Club came from the golfers: the bag fees and tips.

105.    Wykagyl Country Club did not pay Plaintiff Jeffers the statutory minimum wage.

106.    Wykagyl Country Club did not pay Plaintiff Jeffers overtime premium pay.

107.    Wykagyl Country Club did not pay Plaintiff Jeffers spread-of-hours pay.

108.    Wykagyl Country Club did not provide Plaintiff Jeffers with any wage statements.

109.     Wykagyl Country Club did not provide Plaintiff Jeffers with the Notice and Acknowledgment of Payrate and Payday under N.Y. Lab. Law § 195.1.

110.     Plaintiff Jeffers is subject to the same policies, procedures, control and oversight that other Wykagyl Country Club Golf Caddies were subjected to.

111.     Plaintiff Jeffers knows from personal conversations and observations that he performed the same duties as other Golf Caddies, worked approximately the same hours, was compensated the same way and was subject to the same policies and procedures as them.

Christopher Arroyo's Hours Worked and Compensation

112.     Wykagyl Country Club employed Plaintiff Arroyo as a Golf Caddy from about 2007 to November 2022.

113.     While working as a Golf Caddy for Wykagyl Country Club, Plaintiff Arroyo did not work at any other club during its season.

114.     During each golf season at Wykagyl Country Club, Plaintiff Arroyo worked the following regular schedules:

a.     For April, he worked Tuesday to Sunday from 7:00 a.m. to at least 5:00 p.m. (10 hours). He, thus, worked a total of at least 60 hours during the weeks of April.

b.     For May, he worked Monday from 10:00 a.m. to between 4:00 p.m. and 7:00 p.m. (6 to 9 hours), Tuesday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Wednesday from 8:00 a.m. to between 4:00 p.m. and 7:00 p.m. (8 to 9 hours), Thursday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Friday from

6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Saturday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes) and Sunday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes). He, thus, worked between 61 hours and 30 minutes to 80 hours and 30 minutes during the weeks of May.

   c.  For June, he worked Monday from 10:00 a.m. to between 4:00 p.m. and 7:00 p.m. (6 to 9 hours), Tuesday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Wednesday from 8:00 a.m. to between 4:00 p.m. and 7:00 p.m. (8 to 9 hours), Thursday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Friday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Saturday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes) and Sunday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes). He, thus, worked between 61 hours and 30 minutes to 80 hours and 30 minutes during the weeks of June.

   d.  For July, he worked Monday from 10:00 a.m. to between 4:00 p.m. and 7:00 p.m. (6 to 9 hours), Tuesday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Wednesday from 8:00 a.m. to between 4:00 p.m. and 7:00 p.m. (8 to 9 hours), Thursday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Friday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Saturday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes) and Sunday from 6:30 a.m. to between 4:00 p.m.

and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes). He, thus, worked between 61 hours and 30 minutes to 80 hours and 30 minutes during the weeks of July.

e.     For August, he worked Monday from 10:00 a.m. to between 4:00 p.m. and 7:00 p.m. (6 to 9 hours), Tuesday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Wednesday from 8:00 a.m. to between 4:00 p.m. and 7:00 p.m. (8 to 9 hours), Thursday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Friday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Saturday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes) and Sunday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes). He, thus, worked between 61 hours and 30 minutes to 80 hours and 30 minutes during the weeks of August.

f.     For September, he worked Monday from 10:00 a.m. to between 4:00 p.m. and 7:00 p.m. (6 to 9 hours), Tuesday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Wednesday from 8:00 a.m. to between 4:00 p.m. and 7:00 p.m. (8 to 9 hours), Thursday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Friday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Saturday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes) and Sunday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes). He, thus,

worked between 61 hours and 30 minutes to 80 hours and 30 minutes during the weeks of September.

        g.      For October, he worked Tuesday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Wednesday from 8:00 a.m. to between 4:00 p.m. and 7:00 p.m. (8 to 9 hours), Thursday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Friday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes), Saturday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes) and Sunday from 6:30 a.m. to between 4:00 p.m. and 7:00 p.m. (9 hours and 30 minutes to 12 hours and 30 minutes). He, thus, worked between 55 hours and 30 minutes to 71 hours and 30 minutes during the weeks of October.

        h.      For the first two or three weeks in November, he worked 3 to 4 days a week, from 8:00 a.m. to between 4:00 p.m. and 5:00 p.m. (8 to 9 hours). He, thus, worked between 24 hours to 36 hours during the first two or three weeks of November.

        115.    Wykagyl Country Club did not pay Plaintiff Arroyo any compensation during his employment with the Club, not an hourly rate, salary or any other form of compensation.

        116.    Plaintiff Arroyo would, sometimes, be waiting at Wykagyl Country Club up to 4 hours before the Caddy Master assigned him a loop.

        117.    The sole compensation Plaintiff Arroyo received during his employment with Wykagyl Country Club came from the golfers: the bag fees and tips.

118.   Wykagyl Country Club did not pay Plaintiff Arroyo the statutory minimum wage.

119.   Wykagyl Country Club did not pay Plaintiff Jeffers overtime premium pay.

120.   Wykagyl Country Club did not pay Plaintiff Arroyo spread-of-hours pay.

121.   Wykagyl Country Club did not provide Plaintiff Arroyo with any wage statements.

122.   Wykagyl Country Club did not provide Plaintiff Arroyo with the Notice and Acknowledgment of Payrate and Payday under N.Y. Lab. Law § 195.1.

123.   Plaintiff Arroyo is subject to the same policies, procedures, control and oversight that other Wykagyl Country Club Golf Caddies were subjected to.

124.   Plaintiff Arroyo knows from personal conversations and observations that he performed the same duties as other Golf Caddies, worked approximately the same hours, was compensated the same way and was subject to the same policies and procedures as them.

Bobby Hopkins' Retaliation Claims

125.   On or about October 14, 2022, Plaintiff Hopkins, through counsel, sent a draft complaint to Wykagyl Country Club that asserts the Club willfully violated the New York Labor Law and Fair Labor Standards Act by (i) failing to pay the minimum wage, (ii) failing to pay overtime premium pay, (iii) failing to pay the spread-of-hours pay; (iv) failing to provide the N.Y. Lab. Law § 195.1 notice; and (v) failing to provide the N.Y. Lab. Law § 195.3 wage statements.

126.     Wykagyl Country Club, upon information and belief, told many of its members and Golf Caddies about Plaintiff Hopkins' draft complaint.

127.     On or about October 28, 2022, Mark Williams, a golf caddy, approached Plaintiff Hopkins at the Club, stating "You suing the club? What did it ever do to you?"

128.     On or about October 28, 2022 while Plaintiff Hopkins was at Wykagyl Country Club, a member called Plaintiff Hopkins a "selfish prick" for suing the club and told Plaintiff Hopkins, "I don't want you in my group ever f*cking again."

129.     On or about November 14, 2022 while Plaintiff Hopkins was at Wykagyl Country Club, Eric Barrage (Golf Committee Chairman) directed member Chuck Del Piore to approach Plaintiff Hopkins to try to settle the case.

130.     Another member, John Flynn, told Plaintiff Hopkins that he does not want Plaintiff Hopkins to caddy for him because of the contemplated lawsuit.

131.     Other Golf Caddies told him that Club members were calling him greedy, that they were going to fire him anyway, that he is just digging his own grave, and how could he (Plaintiff Hopkins) turn his back on the members.

132.     On March 16, 2023, Wykagyl Country Club re-confirmed and continued its retaliation against Plaintiff Hopkins for bringing this lawsuit.

133.     On March 16, 2023, Plaintiff Hopkins texted Wykagyl Country Club's Caddy Master/Manager/Starter (Michael Lippoth) to learn if the Club had reversed its policy and would now agree to employ him as a Golf Caddy. On March 16, 2023, Lippoth texted Plaintiff Hopkins:

> **Bob I received your text message. You aren't authorized to take any loops until I receive further instructions.**

134.    To date, Wykagyl Country Club has refused to employ Plaintiff Hopkins because of this lawsuit.

135.    Wykagyl Country Club has, upon information and belief, been telling other clubs not to hire Plaintiff Hopkins. For example, Plaintiff Hopkins called Scarsdale Country Club about that club employing him as a caddy and the golf pro there told him, "I know what you did to Wykagyl. And it is not cool," and then hung up on Plaintiff Hopkins.

136.    The retaliation and harassment Plaintiff Hopkins has endured has caused him emotional distress, including stress and anxiety.

<u>CLASS ACTION ALLEGATIONS</u>

137.    Plaintiffs Hopkins, Arroyo and Jeffers assert these allegations and claims on their own and on behalf of a class of persons under Fed. R. Civ P. 23:

> All persons who work or have worked as Golf Caddies at Wykagyl Country Club at any time between December 8, 2016 and the entry of judgment in this case (the "Class Members").

138.     The Class Members identified above are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, and the facts on which the calculation of that number are presently within Wykagyl Country Club's sole control, upon information and belief, more than 100 Class Members exist.

139.     Plaintiffs Hopkins, Arroyo and Jeffers' claims are typical of the Class Members', and a class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation where individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in court against a corporate defendant.

140.     Wykagyl Country Club has acted or refused to act on grounds generally applicable to the Class Members, making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class Members.

141.     Plaintiffs Hopkins, Arroyo and Jeffers are committed to pursuing this action and have retained competent counsel experienced in employment law, wage and hour law, and class action litigation.

142.     Plaintiffs Hopkins, Arroyo and Jeffers have the same interest in this matter as all other Class Members and his claims are typical of Class Members'.

143.     Common questions of law and fact exist as to the Class Members that predominate over any questions solely affecting the individual Class Members, including:

        a.       Whether Wykagyl Country Club employed the Class Members within the meaning of the Labor Law;

        b.       Whether Wykagyl Country Club misclassified the Class Members as independent contractors;

c.      Whether Wykagyl Country Club failed or refused to pay the Class Members the statutory minimum wage;

d.      Whether Wykagyl Country Club failed or refused to pay the Class Members overtime premium pay for all hours worked in excess of 40 hours per workweek;

e.      Whether Wykagyl Country Club failed or refused to pay the Class Members spread-of-hours pay;

f.      Whether Wykagyl Country Club failed or refused to provide the Class Members the N.Y. Lab. Law § 195.1 Notice;

g.      Whether Wykagyl Country Club failed or refused to provide the Class Members the N.Y. Lab. Law § 195.3 Wage Statements;

h.      Whether Wykagyl Country Club willfully or recklessly violated the Labor Law;

i.      Whether Wykagyl Country Club is liable for all damages claimed hereunder, including interest, costs and disbursements and attorneys' fees; and

j.      Whether Wykagyl Country Club should be enjoined from such violations of the Labor Law in the future.

<u>COLLECTIVE ACTION ALLEGATIONS</u>

144.    Under 29 U.S.C. § 206, Plaintiffs Hopkins, Arroyo and Jeffers seek to assert these allegations and claims as a collective action on behalf of a defined group:

> All persons who work or have worked as Golf Caddies at Wykagyl Country Club at any time between December 8, 2019 and the entry of judgment in this case (the "Collective Action Members").

-24-

145.    Plaintiffs Hopkins, Arroyo and Jeffers and the Collective Action Members are similarly situated on several legal and factual issues, including:

a.    Wykagyl Country Club employed the Collective Action Members within the meaning of the FLSA;

b.    Collective Action Members performed similar duties;

c.    Wykagyl Country Club failed to keep true and accurate time records for all hours Plaintiff Hopkins and the Collective Action Members worked;

d.    Wykagyl Country Club willfully or recklessly violated the FLSA;

e.    Wykagyl Country Club should be enjoined from such violations of the FLSA in the future; and

f.    The statute of limitations should be estopped or equitably tolled due to Wykagyl Country Club's statutory violations.

**FIRST CAUSE OF ACTION**
**FAILURE TO PAY THE OVERTIME PREMIUM PAY**
**UNDER THE NEW YORK LABOR LAW**
(On Behalf of Plaintiffs Hopkins, Arroyo and Jeffers and the Class Action Members)

146. Plaintiffs Hopkins, Arroyo and Jeffers, on behalf of themselves and the Class Members, repeat and reallege every allegation of the preceding paragraphs as if fully set forth herein.

147. Wykagyl Country Club is an "employer" within the meaning of Labor Law §§ 190, 196-d, 651(5), 652 and supporting New York Statement Department of Labor Regulations and employed Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members.

148. Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members are "employees" within the meaning of the Labor Law.

149. Wykagyl Country Club misclassified the Golf Caddies as independent contractors when they should have been classified as employees.

150. Wykagyl Country Club has more than 11 employees.

151. Neither the bag fees nor tips count towards Wykagyl Country Club's statutory obligation to pay its Golf Caddies overtime premium pay.

152. Under the Labor Law and supporting New York Statement Department of Labor Regulations, Wykagyl Country Club is required to pay Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members 1.5 times their regular rate of pay for all hours they worked in excess of 40.

153. Wykagyl Country Club failed to pay Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members overtime premium pay for any hour they worked above 40 in a week, violating the Labor Law. N.Y. Lab. Law § 650.

154. Wykagyl Country Club willfully violated Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members' rights by failing to pay them overtime compensation at rates not less than 1.5 times the regular rate of pay for each hour worked in excess of 40 hours in a workweek, violating the New York Labor Law and its regulations.

155. Wykagyl Country Club failed to pay the Class Members the overtime wages to which they were entitled, violating the Labor Law.

156. Assuming *arguendo* the bag fees do count towards its overtime obligations, Wykagyl Country Club would be required to pay its Golf Caddies 1.5 times the Caddies' effective hourly rate as overtime premium pay. Wykagyl Country Club did not, however, pay the Golf Caddies any overtime premium pay when they worked above 40 hours.

157. Wykagyl Country Club willfully violated the Labor Law by knowingly and intentionally failing to pay the Class Members overtime wages.

158. Pursuant to the Labor Law, Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members are entitled to recover from Wykagyl Country Club their unpaid wages, liquidated damages, reasonable attorneys' fees, costs, pre and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

<u>SECOND CAUSE OF ACTION</u>
FAILURE TO PAY MINIMUM WAGE
UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs Hopkins, Arroyo and Jeffers and the Class Action Members)

159. Plaintiffs Hopkins, Arroyo and Jeffers, on behalf of themselves and the Class Members, repeat and reallege every allegation of the preceding paragraphs as if fully set forth herein.

160.     Under the Labor Law, Wykagyl Country Club was and is required to pay Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members the statutory minimum wage. N.Y. Lab. Law § 652.

161.     Neither the bag fees nor tips count towards Wykagyl Country Club's statutory obligation to pay its Golf Caddies minimum wage.

162.     Wykagyl Country Club failed to pay Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members the minimum wage, violating the Labor Law.

163.     Wykagyl Country Club willfully violated the Labor Law by knowingly and intentionally failing to pay Plaintiffs Hopkins, Arroyo and Jeffers and Class Members the minimum wage.

164.     Pursuant to the Labor Law, Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members are entitled to recover from Wykagyl Country Club their unpaid wages, liquidated damages, reasonable attorneys' fees, costs, pre and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

THIRD CAUSE OF ACTION
FAILURE TO PAY SPREAD-OF-HOURS PAY
UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs Hopkins, Arroyo and Jeffers and the Class Action Members)

165.     Plaintiffs Hopkins, Arroyo and Jeffers, on behalf of themselves and the Class Members, repeat and reallege every allegation of the preceding paragraphs as if fully set forth herein.

166.     Wykagyl Country Club willfully failed to pay Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members one additional hour at the minimum wage rate for each day they worked ten or more hours, violating 12 N.Y.C.R.R. § 146.-1.6.

167. Due to Wykagyl Country Club's Labor Law violations, Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members are entitled to recover from Wykagyl Country Club their unpaid spread-of-hours pay, liquidated damages, reasonable attorneys' fees, costs, pre and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

FOURTH CAUSE OF ACTION
FAILURE TO PROVIDE 195.1 NOTICE
UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs Hopkins, Arroyo and Jeffers and the Class Action Members)

168. Plaintiffs Hopkins, Arroyo and Jeffers, on behalf of themselves and the Class Members, repeat and reallege every allegation of the preceding paragraphs as if fully set forth herein.

169. Wykagyl Country Club willfully failed to supply Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members with the required Notice and Acknowledgement of Pay Rate and Payday under § 195.1(a) within 10 business days of their first employment date.

170. Due to Wykagyl Country Club's violations of N.Y. Lab. Law § 195.1, Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members are entitled to recover from Wykagyl Country Club $50.00 for each workday that the violations occurred or continue to occur, or a total of $5,000.00, reasonable attorneys' fees, costs, injunctive and declaratory relief. N.Y. Lab Law § 198(1)-b (2016).

## FIFTH CAUSE OF ACTION
## FAILURE TO PROVIDE 195.3 WAGE STATEMENT
## UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs Hopkins, Arroyo and Jeffers and the Class Action Members)

171.     Plaintiffs Hopkins, Arroyo and Jeffers, on behalf of themselves and the Class Members, repeat and reallege every allegation of the preceding paragraphs as if fully set forth herein.

172.     Wykagyl Country Club willfully failed to supply Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members with an accurate wage statement with each payment of wages, violating N.Y. Lab Law § 195.3.

173.     Due to Wykagyl Country Club's violations of N.Y. Lab Law § 195.3, Plaintiffs Hopkins, Arroyo and Jeffers and the Class Members are entitled to recover from Wykagyl Country Club $250.00 for each workday that the violations occurred or continue to occur, or a total of $5,000.00, reasonable attorneys' fees, costs, injunctive and declaratory relief. N.Y. Lab Law § 198(1)-d (2016).

## SIXTH CAUSE OF ACTION
## RETALIATION UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiff Hopkins)

174.     Plaintiff Hopkins repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

175.     Plaintiff Hopkins is an employee under N.Y. Lab. Law § 215.

176.     Wykagyl Country Club is an employer under N.Y. Lab. Law § 215.

177.     Plaintiff Hopkins, through counsel, complaining about Wykagyl Country Club's Labor Law violations constitutes protected activity under the Labor Law.

178.     Plaintiff Hopkins' original Complaint constitutes protected activity under the Labor Law.

179. Wykagyl Country Club harassed, threatened and refused to employ Plaintiff Hopkins for complaining about its Labor Law violations, violating N.Y. Lab. Law § 215.

180. The retaliation and harassment Plaintiff Hopkins has endured would deter or dissuade a similar working for making similar complaints.

181. A causal connection exists between Plaintiff Hopkins' protected conduct and Wykagyl Country Club's retaliatory acts.

182. Due to Wykagyl Country Club's Labor Law violations, Plaintiff Hopkins is entitled to recover compensatory damages, reasonable attorneys' fees, costs, and such other legal and equitable relief as this Court deems just and proper.

SEVENTH CAUSE OF ACTION<br>FAILURE TO PAY THE MINIMUM WAGE UNDER THE FLSA<br>(On Behalf of Plaintiffs Hopkins, Arroyo and Jeffers and the Collective Action Members)

183. Plaintiffs Hopkins, Arroyo and Jeffers repeat and reallege every allegation of the preceding paragraphs as if fully set forth herein.

184. Wykagyl Country Club has been and continue to be, an employer engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

185. Wykagyl Country Club employed Plaintiffs Hopkins, Arroyo and Jeffers and the Collective Action Members within the meaning of the FLSA.

186. Neither the bag fees nor tips count towards Wykagyl Country Club's statutory obligation to pay its Golf Caddies minimum wage.

187. Wykagyl Country Club knowingly failed to pay Plaintiffs Hopkins, Arroyo and Jeffers and the Collective Action Members the minimum wage.

188. Wykagyl Country Club was required to pay Plaintiffs Hopkins, Arroyo and Jeffers and the Collective Action Members the minimum wage rate for all hours worked.

189. Because Wykagyl Country Club's FLSA violations were willful, a three-year statute of limitations applies under 29 U.S.C. § 255.

190. As a result of Wykagyl Country Club's FLSA violations, Plaintiffs Hopkins, Arroyo and Jeffers and the Collective Action Members have suffered damages by being denied minimum wages in accordance with the FLSA in amounts to be determined at trial, and is entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensations under 29 U.S.C. § 216(b), and such other legal and equitable relief as this Court deems just and proper.

EIGHTH CAUSE OF ACTION
FAILURE TO PAY OVERTIME UNDER THE FLSA
(On Behalf of Plaintiffs Hopkins, Arroyo and Jeffers and the Collective Action Members)

191. Plaintiffs Hopkins, Arroyo and Jeffers repeat and reallege every allegation of the preceding paragraphs as if fully set forth herein.

192. Neither the bag fees nor tips count towards Wykagyl Country Club's statutory obligation to pay its Golf Caddies overtime premium pay.

193. Wykagyl Country Club was required to pay Plaintiffs Hopkins, Arroyo and Jeffers and the Collective Action Members no less than 1.5 times the regular rate at which they were employed for all hours worked in excess of 40 hours in a workweek under the overtime wage provisions set forth in the FLSA, 29 U.S.C. §§ 201, *et seq*., including 29 U.S.C. §§ 207(a)(1) and 215(a).

194. At all relevant times, Wykagyl Country Club had a policy and practice of refusing to pay Plaintiffs Hopkins, Arroyo and Jeffers and the Collective Action Members the proper overtime compensation for their hours worked in excess of 40 hours per workweek.

195. Assuming *arguendo* the bag fees do count towards its overtime obligations, Wykagyl Country Club would be required to pay its Golf Caddies 1.5 times the Caddies' effective hourly rate as overtime premium pay. Wykagyl Country Club did not, however, pay the Golf Caddies any overtime premium pay when they worked above 40 hours.

196. Wykagyl Country Club was aware or should have been aware that the practices described in this Complaint were unlawful, making its violations willful or reckless.

197. Wykagyl Country Club has not made a good faith effort to comply with the FLSA with respect to Plaintiffs Hopkins, Arroyo and Jeffers and the Collective Action Members' compensation.

198. Wykagyl Country Club has failed to make, keep and preserve records with respect to its employees sufficient to determine the wages, hours, and other conditions and practices of employment, violating the FLSA, 29 U.S.C. §§ 201, 207(a)(1) and 215(a).

<u>NINTH CAUSE OF ACTION</u>
RETALIATION UNDER THE FLSA
(Brought on behalf of Plaintiff Hopkins)

199. Plaintiffs Hopkins repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

200. With the draft complaint and filing the Original Complaint in this matter, Plaintiff Hopkins engaged in protected activity under the FLSA.

201. Wykagyl Country Club harassed, threatened and refused to employ Plaintiff Hopkins for complaining about its FLSA violations, violating 29 U.S.C. § 215(a)(3).

202. The retaliation and harassment Plaintiff Hopkins has endured would deter or dissuade a similar working for making similar complaints.

203. A causal connection exists between Plaintiff Hopkins' protected conduct and Wykagyl Country Club's retaliatory acts.

TENTH CAUSE OF ACTION
RETALIATION UNDER NEW YORK'S WHISTLEBLOWER LAW
(Brought on behalf of Plaintiff Hopkins)

204. Plaintiffs Hopkins repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

205. Plaintiff Hopkins asserts this cause of action in the alternative to the extent the Court determines Plaintiff Hopkins is an independent contractor.

206. Wykagyl Country Club was an employer within the meaning of N.Y. Lab. Law §§ 190, 196-d, 615(5), 652 and supporting New York State Department of Labor Regulations and employed Plaintiff Hopkins.

207. Plaintiff Hopkins complained about Wykagyl Country Club's wage practices which he reasonably believed to violate the FLSA and Labor Law.

208. Wykagyl Country Club threatened, harassed and refused to hire Plaintiff Hopkins in retaliation for his complaints about its wage practices, violating N.Y. Lab. § 740.

209. No legitimate, non-retaliatory reasons exist for the adverse action Wykagyl Country Club took against Plaintiff Hopkins.

210. Wykagyl Country Club's actions against Plaintiff Hopkins were willful, malicious and wanton.

211. Wykagyl Country Club is liable to Plaintiff Hopkins for his loss of wages, liquidated damages, punitive damages, and attorneys' fees and expenses.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs Hopkins, Arroyo and Jeffers respectfully request this Court grant the following relief:

a. Certifying this action as a class action under Fed. R. Civ. P. 23 on behalf of the Class Members and appointing Plaintiffs Hopkins, Arroyo and Jeffers and Lipsky Lowe LLP to represent the Class Members;

b. Designating this action as a collective action on behalf of the Collective Action Members and prompt issuance of notice under 29 U.S.C. § 216(b) to all similarly situated members of an FLSA opt-in collective action, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue under 29 U.S.C. § 216(b) and appointing Plaintiffs Hopkins, Arroyo and Jeffers and their counsel to represent the Collective Action Members and tolling of the statute of limitations;

c. An award for unpaid overtime premium pay under the Labor Law and the FLSA;

d. An award for unpaid minimum wage under the Labor Law and the FLSA;

e. An award of statutory penalties for failing to provide the N.Y. Lab. Law § 195.1 Notice;

f. An award of statutory penalties for failing to provide the N.Y. Lab. Law § 195.3 Wage Statements;

g. An award of liquidated damages as a result of Wykagyl Country Club's Labor Law violations;

h. An award of compensatory and punitive damages for Plaintiff Hopkins' individual retaliation claims;

i. Equitably tolling the statute of limitations under the FLSA;

j. An award of pre-judgment and post-judgment interest;

k. An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

l. Such other and further relief as this Court deems just and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs Hopkins, Arroyo and Jeffers demand

a trial by jury on all questions of fact the First Amended Complaint raises.

Dated: New York, New York
      March 28, 2023

<u>s/ Douglas B. Lipsky</u>
Douglas B. Lipsky
LIPSKY LOWE LLP
420 Lexington Avenue, Suite 1830
New York, New York 10170
Doug@lipskylowe.com
212.392.4772
*Attorneys for Plaintiffs Hopkins, Arroyo and Jeffers*
*and all similarly situated persons*